IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

      Plaintiff,

  -vs-                                                                                                              CRIMINAL No. 12-1085 LH

EFRAIN GONZALEZ-PEREZ,

      Defendant.


**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on the following motions:  (1) the Government's Sealed Notice of Intent to Offer Extra-Judicial Statements, Tape Recorded Evidence, and Motion in Limine Seeking Pretrial Ruling on the Admissibility of Evidence (Doc. 26); (2) Defendant's Motion in Limine (Doc. 27) to exclude inadmissible hearsay evidence regarding Daniel Perez-Soto's immigration status; (3) Defendant's Motion to Dismiss Indictment (Doc. 28); and (4) Defendant's Motion in Limine relating to Expert Testimony of Border Patrol Agent Brian Knoll (Doc. 34).  This Court held a jury trial in this matter on January 28, 2013, through January 29, 2013.  During an in-chambers pretrial hearing and during trial, the Court made rulings regarding these motions.

      Defendant did not object to the Government's request to admit the phone recordings and the Spanish and English transcripts of those recordings.  The Government's Sealed Notice of Intent to Offer Extra-Judicial Statements, Tape Recorded Evidence, and Motion in Limine Seeking Pretrial Ruling on the Admissibility of Evidence (Doc. 26) was therefore granted

without objection.

As for Defendant's Motion in Limine (Doc. 27) to exclude inadmissible hearsay evidence regarding Daniel Perez-Soto's statements to agents made after his detention and arrest, the Government agreed to not present any inculpatory statements made by Mr. Perez-Soto to agents following his arrest.  The Court therefore granted Defendant's motion to the extent it requested exclusion of *inculpatory* statements Daniel Perez-Soto made to agents following his arrest that would have been offered for their truth.  The Court denied the motion to the extent it requested exclusion of the *exculpatory* statements Daniel Perez-Soto made to agents following his arrest that the Government did not offer for the truth of the matter asserted.

As to Defendant's Motion in Limine relating to Expert Testimony of Border Patrol Agent Brian Knoll (Doc. 34), the Court initially deferred ruling until Agent Knoll's testimony at trial.  After the Government presented Agent Knoll's qualifications and experience at trial, the Government moved under Federal Rule of Evidence 702 to proceed.  At trial, Defendant did not object.  The Court therefore granted the Government's request to proceed under Rule 702. Thereafter, Defendant objected to one question, arguing it went to an ultimate issue for the jury. The Court overruled the objection, effectively denying at least one issue presented in Defendant's motion to exclude the expert testimony of Agent Knoll.

Following the presentation of evidence at trial, the Court also denied Defendant's Motion to Dismiss Indictment (Doc. 28).

The jury subsequently returned a verdict of guilty against Defendant.  This Memorandum Opinion and Order serves to clarify the Court's prior oral rulings and provide additional foundation and reasoning for the rulings previously announced.

**I.     FACTUAL BACKGROUND[1]**

In November 2010, FBI Special Agent John Wardle, during the course of investigating alien smuggling organizations in New Mexico, began surveillance of Defendant. In the summer of 2011, a Confidential Human Source ("CHS1"), referred to as "John Smith" at trial, was arrested for alien transporting, and following debriefing, began to work for the FBI in exchange for his charges being dismissed. CHS1 also received nearly $5000 from the FBI for his work for them. CHS1 made recorded phone calls for the FBI and made calls to Defendant.

On March 9, 2012, Defendant called CHS1, the conversation of which was recorded and portions of which the Government presented, and the Court admitted without objection, at trial. In the March 9, 2012 conversation, Defendant told CHS1 that "the fucker is still there," asks when it can be done, and says that he will get for CHS1 the phone number from where he is. *See* Trial Exhibit 1A.

On March 14, 2012, Defendant again spoke with CHS1, which was also recorded. Defendant gave CHS1 a phone number and said to say he was looking for a "Daniel the namesake." *See* Trial Exhibit 1B. The Government presented, and the Court admitted without objection, this call as well.

On March 14, 2012, at 7:30 p.m. Agent Wardle met with John Smith, who had obtained the residence where the man was staying.[2] Agent Wardle asked him to stay a few minutes so he and other agents could perform surveillance on the address when John Smith picked him up.

---

[1] The majority of the following facts were those presented by the Government during its case-in-chief at trial. The Court has included some facts, however, that were not presented at trial, but were proffered by the Government in support of their motions and responses. With respect to these latter facts, the Court has included them because they are relevant to understanding the Court's ruling on the motions.

[2] Upon arriving in El Paso, on March 14, 2012, CHS1 called the man in El Paso, later identified by the agents as Daniel Perez-Soto, to pick him up and drive him to Las Cruces. During the recorded conversation, Mr. Perez-Soto described how he crossed the border, had been in El Paso for some time, and mentions "Efrain." *See* Government's Sealed Resp., Ex. 1 (Doc. 31-1). The contents of this call, and the fact that it was made, were not offered or admitted at trial. The Government argues, however, that it could have admitted the contents of this call at trial if Mr. Perez-Soto had testified.

3

Agent Wardle observed a man with a white cap and backpack emerge from a trailer home in El Paso and get into CHS1's vehicle. Agent Wardle conducted surveillance and observed them drive to a Motel 6 in Las Cruces. CHS1 took the man to Room 204 at the Motel 6. Both men came out to the balcony. The agents had instructed CHS1 to show the man where he would be picked up the next morning, which he did. CHS1 kept the motel room key and gave it to the agents. The purpose of CHS1 taking the key is that it is standard procedure for alien smuggling organizations to keep the key to try to prevent the illegal alien from departing, because if he left the room and the door closed behind him, he would not be able to re-enter the room. The agents ceased surveillance for the night, but returned the next morning around 7 a.m. to continue surveillance.

Confidential Human Source 2 ("CHS2"), referred to as "James Jones" at trial, arrived the next morning in a tractor-trailer. At around 8:00 a.m., the man from Room 204 emerged with his backpack, and got into the flatbed 18-wheel tractor-trailer. CHS2 began driving north to Albuquerque. Agent Wardle and other border patrol and FBI agents followed the tractor-trailer northbound on Interstate 25.

CHS2 passed through the border patrol checkpoint on Interstate 25. CHS2 told his passenger to get into the sleeper compartment and pull the curtain across as they passed through the checkpoint. Border Patrol agents at the checkpoint, aware of the investigation, permitted CHS2 to continue driving north.

CHS2 and his passenger drove north and arrived at the T.A. truck stop at the intersection of Menaul and University in Albuquerque. Agents conducted surveillance at the truck stop and witnessed Defendant meet with CHS2 and his passenger. Defendant paid $1,200 cash to CHS2. Agent Brian Regan later conducted a traffic stop of CHS2's tractor-trailer in order to continue

the ruse.  CHS2 gave the cash to Agent Regan.

Defendant and the passenger then walked to Defendant's blue Dodge pickup truck and drove a block away when Albuquerque Border Patrol Agent Jaime Armendariz stopped the vehicle.  Agent Armendariz asked both Defendant and the passenger about their citizenship.  The passenger made no claim to citizenship.  Nor did the passenger provide any documents that proved he was lawfully in the United States.  Agent Armendariz arrested both Defendant and the passenger.

Defendant was later released, and subsequently, he made a couple phone calls to John Smith.  In a brief call, he said, "it's done."  Later in the afternoon, Defendant called again and told him that it hadn't gone well, he couldn't talk, and he would call him later.  The next day, Defendant called John Smith and said it was all "fucked up," he had been arrested, he assured him he had not said anything, he could not confirm what the other man said, and he recommended that John Smith get rid of his phone and no longer call him at the same phone number.

On March 15, 2012, Border Patrol Agent Matthew Bernard processed the passenger. Agent Bernard entered the passenger's fingerprints into the Ident computer system.  Ident compares an individual's fingerprints with other fingerprints in multiple law enforcement databases.  In Agent Bernard's experience using the Ident system, it is accurate.  The results of the Ident system identified the passenger as Daniel Perez-Soto, and showed that he had one prior voluntary return after an arrest in Oklahoma City in 2009.  According to the Ident and Enforce computer systems, Mr. Perez-Soto was in the United States illegally.

That same day, on March 15, 2012, Special Agent Wardle interviewed Mr. Perez-Soto. According to Agent Wardle's report of the interview, Mr. Perez-Soto provided the following

5

information:  He first entered the United States in 1989 and had lived in Los Angeles for nine years.  Around 1997, he moved to Cactus, Texas, near Amarillo, and at one point in time, he had a work authorization permit.  In 2008, Mr. Perez-Soto was arrested after being pulled over and found using his uncle's driver's license.  He was subsequently ordered deported from the United States but agreed to leave voluntarily.  He surrendered his work authorization permit, and returned to Mexico in July 2011.  After a few months, he decided to return to the United States due to the conditions in Chihuahua and wanted to return to Cactus, where his son, who is a United States citizen, was living.  He travelled to Juarez where he met some "guys" who showed him where to cross the border illegally.  He crossed the border, met a coyote in El Paso who gave him a ride in the trunk of his car to Albuquerque for $1,500.

Importantly to the motion to dismiss, and contrary to his statement to Agent Armendariz, Mr. Perez-Soto told Agent Wardle that he then lived with some cousins for about a month at a house near the Flying J truck stop in Albuquerque.  He stated that he was looking for employment and that a truck driver friend who he had known for a long time told him about a man named "Efrain" who would hire Mr. Perez-Soto to distribute product in Albuquerque.  According to Mr. Perez-Soto, the truck driver gave him a ride to the T.A. truck stop from the house near Flying J where Efrain picked up Perez-Soto and was going to familiarize him with the job.

The Government subsequently allowed Mr. Perez-Soto to voluntarily depart to Mexico.  His location is currently unknown.  According to the agents, it is possible for a person to apply for and gain United States citizenship through a son who is a citizen.  None of the agents, however, notified Mr. Perez-Soto of this possibility.  Agent Wardle also acknowledged that people with work permits commonly apply for a Social Security number.  According to Agent

6

Wardle, when the Government uses a material witness and allows that individual to stay in the United States legally, it is at the will of the individual. Moreover, Agent Wardle did not believe he could have used Mr. Perez-Soto as a witness, given that his statements to Agent Wardle regarding how he arrived in Albuquerque contradicted Agent Wardle's own observations.

Defendant was indicted on May 8, 2012, approximately two months after the Government deported Mr. Perez-Soto back to Mexico.

## II.   ANALYSIS

### A.   Defendant's Motion in Limine (Doc. 27)

The Government agreed with Defendant that it cannot introduce Mr. Perez-Soto's own post-arrest statements about his immigration status made to Special Agent Wardle, because they constitute testimonial statements that fit within the meaning of the Confrontation Clause. To that limited extent, the Government acknowledged that the motion in limine can be granted.

However, the Government argued that, to the extent Defendant seeks exclusion of additional evidence, the motion should be denied. In particular, the Government asked to present evidence concerning Mr. Perez-Soto's *exculpatory statements* to the jury. Specifically, it sought to admit Mr. Perez-Soto's statements that he had hitched a ride to Albuquerque from a truck driver, that he had been living with cousins in Albuquerque for the month prior to his arrest, and that he met Defendant at the truck stop so that Defendant could familiarize him with a job. The Government asserts that the statements of Mr. Perez-Soto, when he starts to lie to Defendant's benefit, are admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy that is treated as the party's own admission, and therefore as not hearsay.

The Court agreed with the Government that Mr. Perez-Soto's *exculpatory statements* to

the jury were admissible when offered by the Government, but for reasons different from that provided by the Government. "Hearsay" is defined as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). Because the Government offered Mr. Perez-Soto's statements to show that he gave *false* statements, the Government was not admitting any portion of the statements to prove the truth of the matter asserted. The statements therefore did not constitute hearsay.

Similar reasons support the admission of the exculpatory statements without violating the Confrontation Clause. "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The Tenth Circuit, however, relying on *Crawford*, has stated: "A defendant's confrontation rights are implicated by the admission of testimonial statements against the defendant, however, only when they are admitted to establish the truth of the matter asserted in the statement." *United States v. Pablo*, 696 F.3d 1280, 1287 (10th Cir. 2012). In this case, the Government offered Mr. Perez-Soto's exculpatory statements not for their truth, but to show the obvious falsity.

The Third Circuit has similarly held that exculpatory statements are admissible, even though testimonial, when they are not offered for their truth. *United States v. Lore*, 430 F.3d 190, 209 (3d Cir. 2005). The Third Circuit explained:

> Hurley's and Rackley's grand jury testimony was unquestionably "testimonial" within *Crawford*. . . . Nonetheless, a conclusion that the grand jury testimony was admitted properly is not inconsistent with *Crawford*. As we held in *Trala*, testimonial statements are admissible without prior cross-examination if they are not offered for their truth. 386 F.3d at 544 ("*Crawford* does not apply where the *reliability* of testimonial evidence is not at issue[.]"); *see also Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. at 1369 n. 9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). As the district court observed, the grand jury testimony contains self-exculpatory statements denying all wrongdoing. Thus, as in *Trala*,

> these statements "were admitted because they were so obviously false." 386 F.3d at 544–45.

*Id. See also United States v. Faulkner*, 439 F.3d 1221, 1227 (10th Cir. 2006) ("Appellants have not pointed to any of Hargrove's statements as having been offered for the truth of what he was asserting. Accordingly, their Confrontation Clause challenge must fail.")

Consequently, the admission of the portions of Mr. Perez-Soto's statements that are exculpatory and were not offered by the Government for the truth of the matter asserted does not offend the Confrontation Clause. For these reasons, the Court denied Defendant's Motion in Limine (Doc. 27) to the extent Defendant requested exclusion of the exculpatory statements Daniel Perez-Soto made to agents following his arrest that the Government did not offer for the truth of the matter asserted.

### B. Defendant's Motion to Dismiss Indictment (Doc. 28)

Defendant asserted that the Government released Mr. Perez-Soto back to Mexico without giving defense counsel an opportunity to conduct his deposition. Defendant asked the Court to dismiss the Indictment based on his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process. Defendant argued that Mr. Perez-Soto's statements to Agent Wardle were exculpatory to the defense because he explained that someone else smuggled him to Albuquerque, he had been living in Albuquerque for around a month with his cousins, and his meeting with Efrain was for employment purposes. Defendant asserted that, because Mr. Perez-Soto had lived in the country for a long period of time and at one point had a work authorization permit, it can be inferred that he might have had valid papers or a social security number that would have permitted him to appear as if he could be lawfully employed. Defendant argued that admitting Mr. Perez-Soto's exculpatory statements to Agent Wardle cannot cure the constitutional error, because an out-of-court statement is much less persuasive

than having Mr. Perez-Soto's live testimony.

In a sealed response, the Government requested that the Court deny the motion, or at a minimum, hold it in abeyance until the presentation of evidence at trial or at a pretrial hearing. The Government admitted that the evidence may be favorable and material, but that it would not have affected the jury in light of the overwhelming evidence of Defendant's guilt, which also showed that Mr. Perez-Soto lied about he came to be in Albuquerque. The Government also asserted there is no evidence of bad faith.

The Court held the motion in abeyance until the close of the evidence at trial. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982) (explaining that judges may defer ruling on motions for sanctions based on deportation of a witness until after the presentation of the evidence at trial in order to best determine the materiality of the evidence). At the close of evidence, the Court denied the motion to dismiss the indictment. The following analysis provides the reasons for the Court's decision.

"The mere fact that the Government deports [illegal-alien] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." *Valenzuela-Bernal*, 458 U.S. at 872-73. When prompt deportation deprives a defendant of an opportunity to interview the witness, the specificity required to show materiality is relaxed. *See id.* at 870. A defendant need not provide a detailed description of the disputed testimony. *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997). Rather, in such cases, to impose sanctions on the Government, the defendant must make "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal,* 458 U.S. at 873. As part of this showing of

materiality, a defendant must demonstrate that "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *See id.* at 873-74. Additionally, the defendant must show that the government acted in bad faith by allowing the witness with potentially exculpatory information to depart. *Iribe-Perez*, 129 F.3d at 1173 (citing *Valenzuela-Bernal*, 458 U.S. at 873, and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. To show bad faith, a defendant must present evidence of official animus or a conscious effort to suppress exculpatory evidence. *California v. Trombetta*, 467 U.S. 479, 488 (1984) (concluding that government acted in good faith and in accord with their normal practice in failing to preserve breath samples where record contained no allegation of official animus or conscious effort to suppress exculpatory evidence); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (explaining that, when attempting to show the motives of the Government when it arranges for departure of a witness, the defendant must prove official animus or a conscious effort to suppress exculpatory evidence). The Ninth Circuit has stated that a defendant may establish bad faith by showing either that the Government departed from normal deportation procedures or that the Government deported the witness to gain an unfair tactical advantage over the defendant at trial. *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000).

The Court concludes that, while Mr. Perez-Soto's statements to Agent Wardle were favorable to the defense, they were not sufficiently material to affect the judgment of the jury. The majority of evidence, particularly the phone calls and surveillance evidence presented, demonstrated that Mr. Perez-Soto lied when he said he had been in Albuquerque for a month and

was meeting Defendant solely for employment opportunities.  Mr. Perez-Soto's statement that he had previously lived in the United States and at one point had a work authorization permit is plausibly favorable if Mr. Perez-Soto had presented Defendant with evidence that he appeared to be able to lawfully work in the United States.  Again, however, it is not material and could not have affected the judgment of the jury, in light of the overwhelming evidence against Defendant.

Defendant was free to, and did, argue to the jury that Mr. Perez-Soto's statements, and any additional statements he might have made were he here, were exculpatory.  *See Youngblood*, 488 U.S. at 59 ("The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.").  At trial, Defendant presented to the jury the main thrust of Mr. Perez-Soto's allegedly exculpatory information through the statements themselves, and thus, the additional benefit of further testimony is lessened.  *Cf. Pena-Gutierrez*, 222 F.3d at 1085-86 (holding that deported witness's testimony was merely cumulative of testimony of available INS agent who testified to same point as that expected of deported witness when agent said that deportee stated that no money was to be paid or exchanged for vehicle transport).

Defendant also has not shown a credible reason to believe that Mr. Perez-Soto would have testified for Defendant instead of invoking his Fifth Amendment privilege to remain silent.  As the Government points out, in light of the overwhelming evidence showing that Mr. Perez-Soto lied when he said he had been living in Albuquerque for the past month, it is reasonable to believe that Mr. Perez-Soto might have invoked his right to remain silent for fear of facing charges for lying to a federal investigator.  Moreover, the Government offers a compelling argument that, had Mr. Perez-Soto testified at trial, it would have benefitted because it could

have admitted large segments of Mr. Perez-Soto's conversation with CHS1 that further implicated Defendant and are damaging to Defendant's case. *See* Resp., Ex. 1 (Doc. 31-1).

Furthermore, the Court concluded that Defendant did not establish that the Government acted in bad faith in allowing Mr. Perez-Soto to voluntarily depart the United States. The Government disclosed Mr. Perez-Soto's statements to Defendant, indicating that they were not engaged in a conscious effort to suppress exculpatory evidence. The Government also provided a reasonable explanation for why it did not deem Mr. Perez-Soto's statements exculpatory – the statements that he had been living in Albuquerque for the month prior to his arrest appeared to be a fabrication, given all the other evidence from the Government's investigation, particularly their surveillance of him from El Paso to Albuquerque. Finally, there is no evidence in the record that the Government departed from normal deportation procedures in allowing Mr. Perez-Soto to voluntarily depart to Mexico. The Government gave a reasonable explanation for why it did not consider Mr. Perez-Soto a material witness.

In sum, Defendant did not show that there was a reasonable likelihood that the testimony of Mr. Perez-Soto could have affected the judgment of the jury or that the government acted in bad faith by allowing him to depart the country. For all the above reasons, the Court denied Defendant's motion to dismiss the indictment.

  **C. Defendant's Motion in Limine relating to Expert Testimony of Border Patrol Agent Brian Knoll (Doc. 34)**

The Government filed a Notice (Doc. 25) stating that it intended to call Senior Border Patrol Agent Brian Knoll to give expert opinions based on his training and experience of the following: when an alien transporting organization moves an alien from the Mexican border into the interior of the United States, the odds of his illegal presence being detected by immigration authorities decreases and his employment opportunities increase because employers are less

13

likely to require immigration paperwork. The Government subsequently filed an Amended Notice (Doc. 43) proffering that Agent Knoll would testify that when an alien transporting organization moves an alien from one point to another, it typically does so to further the alien's illegal presence in the United States because, as inventory, the alien has value to the alien smuggling organization. Agent Knoll would also testify that moving an alien to a place where he is less likely to be detected furthers the alien's illegal presence in the United States.

Prior to trial, Defendant objected to the admission of expert testimony of Senior Border Patrol Agent Brian Knoll as beyond the expertise of Agent Knoll. He argued that such testimony requires the collection of pertinent data and a statistical analysis of such data, and that Agent Knoll is not a statistician. At trial, however, when the Government, after setting forth Agent Knoll's qualifications, moved to proceed under Rule 702, defense counsel did not object. The Court allowed the Government to proceed. It was therefore unclear whether Defendant had withdrawn the objections set forth in his previously filed motion in limine. Near the end of Agent Knoll's testimony, however, defense counsel objected to the question of the significance, in terms of the motivation of the alien smuggler, of evidence that Defendant paid James Jones $1200. Defense counsel argued that the testimony would invade the province of the jury. The Court overruled the objection. The Government then rephrased the question to ask whether the $1200 payment represented an investment on the part of the smuggler in the alien. Agent Knoll responded that paying $1200 corresponds to an investment in the alien and an incentive to further the alien's illegal presence in the United States. The Court sets forth herein its analysis for why it overruled Defendant's objection to the Rule 702 testimony.

To determine whether an expert opinion is admissible, the district court performs the following two-step analysis: (1) the court must determine whether the expert is qualified by

knowledge, skill, experience, training, or education to render an opinion; and (2) if the expert is so qualified, the court must determine whether the expert's opinion is reliable and helpful under the principles set forth in *Daubert*.[3] *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). The Supreme Court in *Kumho Tire* held that the gatekeeping duty applies to all forms of expert testimony and that the *Daubert* reliability factors might also be applicable in assessing the reliability of non-scientific expert testimony, depending upon the particular circumstances of the case. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-50 (1999). With other non-scientific experts, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150 (emphasis added). The application of extensive experience may be the method used. *See* Joseph W. Cotchett, *Federal Courtroom Evidence* § 702.1, 19-7 (5th ed. 2005) (where law enforcement agent testifies on use of code words in drug transaction, application of agent's extensive experience to analyze meaning of conversations is method used by agent). If the witness is relying primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.* § 702.1, 19-8.

At trial, Agent Knoll testified that Interstates 25 and 40 are major alien smuggling corridors and that an alien smuggler has a profit incentive. He stated that moving an alien from a public place to a privately owned vehicle furthers the illegal presence of the alien by helping the alien avoid detection by law enforcement and aiding getting the person to his ultimate destination. Agent Knoll testified that smugglers' profits decrease if the aliens they are attempting to smuggle are detected by law enforcement.

The Court concluded that Agent Knoll's extensive experience and training with the United States Border Patrol gave him sufficient qualifications to provide the basis for his

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

opinions without statistical data. He has been a Border Patrol agent for 27 years, is ranked 134th among all Border Patrol agents in seniority, had testified as an expert in previous cases, and had considerable field work. Based on his training and knowledge of law enforcement practices along the border, Agent Knoll was qualified to render reliable, helpful opinions regarding the profit motivations in alien smuggling organizations and in the reasons to help aliens avoid being detected by law enforcement by moving them to locations less likely to be detected by Border Patrol agents. *Cf. United States v. McDonald*, 933 F.2d 1519, 1522-23 (10th Cir. 1991) (holding that trial court did not err in permitting expert to testify about significance of quantity of drugs possessed and tools of drug trade); *United States v. Mundy*, 97 Fed. Appx. 844, 846-47 (10th Cir. May 12, 2004) (unpublished opinion) (holding that trial court did not abuse its discretion in admitting expert's testimony regarding different factors that suggest a particular person is either using or distributing drugs).

Defendant also sought exclusion of testimony by Agent Knoll regarding whether the $1200 payment represented an investment on the part of the smuggler in the alien and an incentive to further the alien's illegal presence in the United States, arguing that such testimony goes to the ultimate issue of whether Defendant was acting in furtherance of the alien's illegal presence in the United States, an issue solely for the jury. *Cf. United States v. Banks*, 262 Fed. Appx. 900, *7 (10th Cir. Feb. 1, 2008) (unpublished opinion) (holding that it was error to admit officer's opinion testimony that defendant had requisite intent to distribute narcotics because it was ultimate issue for trier of fact). The Government, however, did not elicit testimony from Agent Knoll regarding Defendant's mental state. The Government merely presented facts that allowed the jury to conclude that Defendant's actions in paying for Mr. Perez-Soto's transport north to Albuquerque and then in transporting Mr. Perez-Soto in his truck furthered his illegal

16

presence in the United States. Such testimony was both relevant and reliable and did not invade the province of the jury in deciding Defendant's particular state of mind. It was still left for the jury to infer that Defendant intended to help Mr. Perez-Soto remain in the United States illegally. *Cf. United States v. Torres*, 53 F.3d 1129, 1141-42 (10th Cir. 1995) (holding that Rule 704(b) did not prevent agent from testifying that he reviewed financial documents of defendants and concluded that defendants' income could not be traced to a legal source of income, because testimony did not expressly intimate an opinion as to a particular state of mind and Rule 704(b) does not prevent expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state). Defendant's motion in limine to exclude Agent Knoll's testimony was therefore denied.

**WHEREFORE, AS PREVIOUSLY ORDERED,**

1.  The Government's Sealed Notice of Intent to Offer Extra-Judicial Statements, Tape Recorded Evidence, and Motion in Limine Seeking Pretrial Ruling on the Admissibility of Evidence (**Doc. 26**) was **GRANTED**;

2.  Defendant's Motion in Limine (**Doc. 27**) was **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  The Court **GRANTED** Defendant's motion to the extent it requested exclusion of inculpatory statements Daniel Perez-Soto made to agents following his arrest that would have been offered for their truth.

    b.  The Court **DENIED** the motion to the extent it requested exclusion of the exculpatory statements Daniel Perez-Soto made to agents following his arrest that the Government did not offer for the truth of the matter asserted.

3. Defendant's Motion to Dismiss Indictment (**Doc. 28**) was **DENIED**; and

4. Defendant's Motion in Limine relating to Expert Testimony of Border Patrol Agent Brian Knoll (**Doc. 34**) was **DENIED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE